Charlotte Ross versus the Office of Personnel Management, appeal number 2013-3125. Ms. Bell, Lloyd, whenever you're ready. May it please the court, Lou Anna Bell Lloyd appearing on behalf of the petitioner appellate, in this case, Charlotte Ross. I know the court has read the briefs in this case. I do just want to highlight a couple of the factual points, and again, noting that there were no facts in this case which were in dispute. But the most important factual component, in my opinion, is the fact, and based upon my argument in this case, is that Charlotte Ross petitioner did not make application for any reinstatement of her survivor benefit until after her husband had already, her former husband was already deceased, which I think is going to tie into my argument on what the intent of Congress was as it related to reinstatement of the survivor benefits under the facts of the case. My first argument is that Charlotte Ross had her first marriage, second marriage annulled by a decree which specifically stated that it was void, in essence, from its inception. So my position is we never get to the argument as to whether the subsection 831.644 apply, because Charlotte Ross never remarried. Her marriage was void, it was void for the inception, so we never get to the argument that she even had to have it annulled because it was void from the inception. But that regulation that you just referenced specifically references annulments. Are you saying that the regulation is invalid? No, I say there's differences in annulments. We have marriages that can be annulled that were not void from their inception, or we can have marriages that are annulled that are void from the inception. My argument is Charlotte Ross' marriage was void from its inception, so there never was a remarriage, which she should have then had to comply with 831.644. So you want us to interpret the word annulment as it's provided for in the regulation in a particular way. Is that right? Right, and I think look at it in connection with all of the subcomponents of that statute that clearly it applies to those individuals who specifically file an application for survivor of 1987 and not remarried before age 55 after September 14, 1978. I'm saying for that group of individuals that are covered under this section, Congress determined that they had to have annulment language as recited therein that it was void from the inception. Charlotte Ross doesn't fit under that subsection clearly, and I will acknowledge that for the annulment language did not apply to her under the facts of the case, because she never remarried. So there was never a triggering event. Well, by operation of the policy, she never remarried, but she clearly remarried, and then it was annulled. Correct, but determined by the court to be void from its inception, which under Kansas laws recited, it's a nullity to begin with. So you may say she remarried, but legally she did not because it was void from the inception. Did she file joint tax returns while she was married before the annulment? I don't know the answer to that question. And if she did, did she go back and unwind them all and pay her taxes? I don't know the answer to that question, Your Honor. Held herself out as married during the period of time up until the time that she was annulled? I would say yes to that answer. Was any publication, was anything in the newspapers when she quote remarried before she got annulled? I do not know the answer to that question. You should know those answers. You're saying she never remarried. That's poppycock. Of course she remarried. She remarried and she enjoyed the fruits of that marriage until such a time as she realized it was going to cut off the money, and she went and got annulled, and the annulment under the law says was void from inception. Correct. It doesn't mean that she was never married. I think legally it does mean... It may mean that she can contend, you know, like if she was a Catholic, she doesn't have to worry about the marriage getting in the way of another marriage. As a practical matter, of course she remarried. Well, I think she went through the steps of... She had fraud on the church. Did she get married in a church? No, Your Honor. She didn't get married in a church. She went to a court. There was fraud on the court. You stand up in front of the court and say, I want to get married, but I don't want to get married because later I'm going to get it annulled. I don't believe that was the intent going in, certainly, to commit a fraud on the church or the court. What the statute says, it cuts off, right, if you remarry. Correct. The benefits are cut off as of the date of the remarriage, right, not as of some later date when maybe you claimed that you were annulled. Right. Last day of the month, I believe, following the remarriage. Is there any indication that Congress intended that statute or OPM intended its regulation to apply differently in states where an annulment makes the marriage void ab initio versus where the annulment just annuls the marriage but doesn't cancel out the fact of the marriage? I could not find anything specific on this issue in doing the research, which I assume is not out there because I noticed that the Voting Council could not either. I mean, isn't Congress allowed to say, if somebody remarries, their annuity is cut off and they don't have to consider some date after the fact that the annulment may occur that in state law makes that marriage void ab initio. Chronologically, there was no remarriage that cut off benefits. I would agree with that and I think that ties generally into my second argument on what the intent of Congress was in reviewing this. And I attached it to my brief. It's page nine. The rules and regulations that were promulgated in the Federal Register when the Spouse Equity Act and the termination of survivor annuities was put in place. And I note in the brief of Voting Council, you know, they state that they believe that the decision was in line with what the intent and the specifications were of Congress. But looking at this, the rules and regulations here, they have two separate cases, really. What happens when a former spouse remarries the retiree and they specifically, you know, have allowed that by specifically stating to interpret the law to prevent her from receiving a survivor annuity would produce an unconscionable result that Congress never intended. And as a result, determined the more reasonable position should be taken, which would entitle her to the benefits. That same argument on looking at what the intent is. But that's when the former spouse remarries the employee.  But again, there was... But that's different. Well, I understand there's a difference from our case. But what I'm relying is that they said was, despite the clear language of what may be in the case, to interpret the law to prevent her from receiving the benefit would be inequitable. And as such, they reached a conclusion she should be entitled. I'm carrying that over into the next argument where they use the alimony argument. Basically, when you remarry, and it seems that the intent of this statute was not allowing an annulment. Well, you keep talking about the statute, but now you're... The regulation. So you agree that D2 applies, right? The D2 is the only thing that talks about an annuity being terminated because of remarriage and then an annulment occurring. Correct. So D2 is what we're looking at here. But you lose on the plain language of D2 because you don't meet the requirements of 4B1B of the Spouse Equity Act. So how do we get around that? I think by looking at what the intent was by Congress in implementing the act. But that sounds to me like an argument that... You're amending the regulation. You're going to... I think you're writing a new provision in the regulation that says, in addition to the two exceptions that are provided there for the circumstance in which there's a remarriage, right? That... And there's an annulment. You still get to keep the annuity. There's another one. And the third one is that where there has been an annulment that says the marriage was void ab initio, then there's no severance of the annuity benefit, right? Coupled with the fact... You're adding that section to the regulation. Coupled with respect to the fact... To answer yes or no. No, not quite. The regulation... Judge Hughes asked you whether you have any benefit from the regulation, assuming it's valid, which I don't think it is. Does the regulation on its face afford you any benefit? Because the regulation says, well, we're dealing with annulments. And where there are annulments, there are two kinds of exceptions where you're going to be okay. And you don't fit either one of those two. On its face, no. But I believe coupled with the fact in this case that what the intent of that application for reinstatement of that benefit until such time as her husband, her former husband had died... Your point is great. There was no schnooking of him, sort of like the alimony situation he did. So there's no harm to him. Nothing's coming out of his pay. Nothing's coming out of him to support her, right? Correct. That's your theory of your argument. But guess what? Who's going to pay her the money? It's not going to come out of his retirement benefit. It's going to come out of my paycheck, and Judge Chen's paycheck, and Judge Yu's paycheck, and yours. The public is going to pay, right? Correct. The public is going to pay. And the public has just as much entitlement as the husband would in the alimony situation, right? Correct. So your whole theory as to why you should be getting the money falls because you're just like the other side of the alimony situation, where the husband is still alive when she asks for the money back. Instead of taking the money from the husband to penalize him, you're penalizing the taxpayers, where the Congress has said, excuse me, if you get remarried, it's over. And the one regulation that OPM decided to give away some money, having to do with an annulment, doesn't fit your case. Correct. With the difference being, though, I think it says that they don't talk about where the money has to come from, Congress, and they look at fairness it seems to be to the spouse, the former spouse, the retiree, if you will. They're not looking at it from a standpoint of it's going to cost the They're basically looking at terms of fairness and what one can count on as they move forward. Admittedly, being unfair to a former spouse to rely upon X amount of dollars of retirement monies or benefits available, cost of coverage, et cetera, rely upon that, have it terminated for four months, four years, whatever the case may be, only to have the spouse come back in and say, Wait, I want my share now, so I'm sorry, former spouse. You have to readjust your entire set of financial circumstances and what you have reasonably relied upon for your retirement monies. And I think that is where the difference lies in this case. And in turn, it does not seem to make any sense or any just rationale to only apply this regulation to a very small window of individuals, particularly which here, you know, coming up shortly, will probably never, ever apply again. It was the OPM's way of saying, even though the Congress told us we can't do this, the Congress told us if there's a remarriage, game's over. Game's over. And OPM feeling big-hearted because of a case in which an actual government retiree had got divorced and remarried the same person and there had been a ruling that was adverse because of what the statute says, OPM decided notwithstanding and contrary to Richmond, OPM against Richmond, which I'm sure you know about, spring court case, they said we're going to give away some money anyhow to a very narrow class of people. Very narrow class of people. They open that window and the window is shut. And you're arguing that the window should be open not to a narrow class. So once OPM actually looked at the question of annulments and they came up with a very narrow little two-way outlet, you're saying the outlet ought to be big enough to drive a truck through. Anyone who, if you're in a state that will annul your marriage and say avoid ab initio, the minute you learn that the money got shut off when the former husband dies, then hop in there and get yourself annulled and guess what, you'll get all the benefits. Well, you could do that in theory even before the individual dies. Sure. Then you wouldn't have your equity argument. Correct. I'm saying that coupled with the fact on what window we're going to look at that Gordon Ross, a former spouse in this case, had already died at the time that she made the application for reinstatement. That's what I'm saying. I am not asking to open it up. No, I understand. I understand that and I see what your argument is. It just seems to me that in the way the game gets played, when the Congress passes a statute that says if you remarry, you lose, it's a little bit much for OPM to come along and say, well, we realize that's what Congress said, but we're not going to pay attention to what Congress said. We're going to have some exceptions. And they carve very narrow little exceptions, which no one here is arguing the regulation is invalid. Correct. Even though when you look at it, they don't cite any authority for it at all. The regulation was promulgated most unusually without any authority being cited for the regulation,  Maybe we can ask the other side about that. All right. Ms. Bell-Loyd, you're out of time, but we'll give you three minutes. All right. Thank you. Great. Let's hear from the government. Just one question, then I'll leave you alone. Are you aware of any authority that was stated for promulgation of the regulation? We're talking about the indulgent regulation. Yes, Your Honor. The regulation cites as authority a 5 U.S.C. Section 8347. That's in the 831 regulation? That's in the 831.644 regulation. The authority cited in my Westlaw version is 5 U.S.C. 8347. What's 8347, Your Honor? And that provides... Don't let me interrupt you right now. I can look it up. Essentially, Your Honor, 8347... I suspect that you've had it. 8347 talks about divorces and remarriages and the like, but it doesn't say anything about annulment. In fact, Your Honor, 8347A provides that OPM shall administer the statute or the subchapter and shall perform or cause to perform such acts and prescribe such regulations as are necessary and proper to carry out the subchapters. It's a fairly broad grant of authority to OPM to implement the subchapter. Can I ask you this question? I'm having a really hard time following the regulatory history here along with the statute, but as far as I can tell, isn't D-2 a nullity now? Not entirely, Your Honor. It would depend on the age of the individual and the sequence of events. I don't understand how that's correct, though, because doesn't D-2 reference... D-2, little 2, says it only applies if the former spouse's entitlement is based upon 4B1B or 4B4 of Public Law 98-615, and 4B1B required any application under this, what I think is a very narrow exception created by the Equity Act, required any application to be filed in 30 months, which is long, long past, right? I'm not certain that the particular provisions require the application to be filed within 30 months. It did require... Well, it did. I mean, I have the law, I have the public law in front of me. It has a number of requirements. It talks about a former marriage being dissolved after September 14th, which is the date of the CSRA. They were married to an employee for 10 years, and it goes on, and then one of the latter things is that the former spouse files an application for the annuity with the office within 30 days after the date of the enactment of the Act. Right. So, as far as I can tell, this whole little unique provision was when they enacted the Retirement Equity Act or whatever you're calling it, it was prospective only, and it only went into effect a certain number of days after enactment, but Congress recognized that there were people before the date who couldn't have made the necessary arrangements, but they didn't want to deprive them of the Equity Act, and they said, for this select group that meets all these criteria, if you file an application within 30 months, you'll get it, and you'll get it not out of the retirement fund, but some other fund, which is where all this language comes about for that, but then OPM seems to have confused that when it issued its Federal Register Notice kind of re-designating this and talking about all the alimony stuff. When D2, Roman numeral 2, just can't apply anymore. Am I missing something there? Let me make a small, what I believe is a small correction. The latest version, as I understand it, which is cited in 5 U.S.C. section 8341 in the note, the latest version of the Equity Act states as a requirement in section B sub 4, the requirement is that the former spouse files an application for the survivor annuity with the office on or before May 7, 1989. I believe that is the most recent version of the statute, and I assume that's correct. Well, that's 30 days after the date of the enactment of the Act. 30 months, yeah. Or 30 months, sorry, yeah. 30 months, right. But still, isn't that my point? Windows closed. Why is this regulation still on the books? The regulation is still on the books to the extent that any former spouses can meet all of the requirements, including the requirement that they file an application on that date. So you're suggesting that there may be applications that were filed prior to 1989 that are still out there pending before OPM? We don't have information on that, Your Honor. I would hope not. I'm sorry? I would hope not. But the regulation, as Your Honor knows, was enacted nearly 20 years ago. Can I just ask you this? Assuming that there are no pending applications from 30 years ago or almost 25 years ago, then am I right that this D-2 is a nullity? On those hypothetical facts, Your Honor, and again, the regulation is nearly 20 years old at this point, but on those hypothetical facts, it may be that there is no one who would be eligible under D-2, and as such, no one could satisfy the requirements of D-2. However, we know from the Federal Register that the intent of OPM in making this regulation was to provide for reinstatement of entitlement to a former spouse's annuity to a limited class of individuals who otherwise would not be eligible under the statute. Even though the statute on its face is pretty clear that there are no exceptions. The statute provides that at the time of remarriage or at the end of the month after the remarriage, the benefits end. However, the statute is silent as to whether that entitlement can be reinstated, Isn't this all still just about the group that occurred prior to the enactment of this act? If somebody, this can't apply to anybody after the act. If they got remarried and annulled after the act, this regulation doesn't apply, right? That may well be that someone in that situation could not satisfy all of the requirements. Right, because this exception only applies to these. Isn't what the real point of this probably, although OPM doesn't seem to comprehend this, is that somebody prior to the date of the act may have been getting a survivor annuity, got remarried before 55, so it got cut off, but the marriage was annulled, so OPM decided perhaps as a gap-filling measure, maybe an invalid exercise of its authority since that person was no longer remarried before the enactment of the act, they would give those people benefits too. OPM did decide to give benefits to a small class of individuals. No, OPM decided to interpret Congress' direction to give that, to include somebody who got remarried and annulled. OPM obviously can't give benefits itself. I'm sorry, Ms. Folker. OPM decided to provide for benefits for a small class of former spouses, and to do that it did point to and incorporate the provisions of the act. Do you think that's a valid gap-filling regulation? I mean, it seems pretty clear that Congress just said if you remarry, you're out. How can OPM create an exception for people who got annulled? Well, first of all, Ms. Ross is not challenging the act. I'm not talking about Ms. Ross. And second of all, whether she had standing or not. If her theory prevailed, you would be challenging the regulation. She proposes to amend the regulation, as we talked earlier, to enlarge, to include a very large category of people, that is to say, and she generously says you've got to wait and file after the deceased of the garment worker. But anybody who gets a non-protonic annulment back to day one wins. Under her interpretation of the regulation, the class of individuals who would be eligible would be much larger. For the purpose of argument, we agreed with her, and we said that's how you interpret the statute. Interpret the regulation. Say there was a gap here, adequate Chevron authority for you to promulgate the regulation, and we interpret it the way she does. You would challenge that interpretation, wouldn't you? Hers. We would disagree with her interpretation. We do disagree with her interpretation. You would say there's no authority for that. Well, we wouldn't necessarily say there's no authority. We would say that's not the regulation that was written. That's not the plain language of the regulation. Wait, so you're saying, this is where I'm getting a little confused. You're saying right now that if OPM decided to go out with a regulation that says, even though there's a statute on the books that says remarriage before 55 terminates benefits, OPM could decide to say, well, they don't specifically address the effect of the annulment, so we're going to say if it's annulled, then you get benefits. Our position is that the statute is silent as to whether reinstatement of a former spouse annuity can ever occur, and that's the Downs case. This court stated that in the Downs case. OPM has provided under this regulation for an exception for a narrow class of individuals. But that exception is entirely based on the exception that Congress put in the public law. That's correct. It's not based upon anything else. It's specifically authorized there. That's correct, Your Honor. And we don't have a position on whether OPM could expand the class on its own by amending the regulation. That issue is not before the court at this time. Our position is that the language of the regulation is plain. You're working real hard to find the silence in the statute that gives you the authority to promulgate the regulation. Because, I mean, the statute, although it says because of remarriage before age 55, it's silent about what happens if you remarry before 65. It's silent as to what happens if you remarry before age 65 because it only says 55. In fact, the statute says that the annuity shall terminate when the former spouse remarries before becoming age 55. After age 55, the statute does not provide that. They still get the annuity if they remarry after 55. I'm sorry, Your Honor? They still get the annuity if they remarry after 55, don't they? That is my understanding of the statute as written. Also, my understanding is that this section, termination of benefits, does not apply if the former spouse is married for at least 30 years. So Congress did provide exceptions, the 55 age limitation and the 30-year marriage exception, these two exceptions to the rule that the benefits were terminated. Again, the regulation as written, though, is plain and unambiguous. And if I may address something that counsel in the court discussed earlier, unless there are other questions, the plain language of D-1, excuse me, D-2 sub I, is that the decree of annulment states that the marriage is without legal effect retroactively from the marriage's exception. Therefore, OPM accounted for the effect of the decree of annulment. In that regard, state law does not figure into the requirements of the regulation. But again, Ms. Ross. Your opponent wants to read out sub part little I, little II. That seems to be correct, or wishes to expand it to include any former spouses whose annulment occurred after the death of the employee. That would clearly be a rewriting of the regulation that, as this Court has stated repeatedly,  Instead, Ms. Ross's remedy lies with Congress or with the Office of Personnel Management. Sometimes when regulations like this get promulgated, the Congressional Budget Office makes a prediction as to what it's going to cost to affect all of this. Was there any such estimate done by CBO here? We don't have anything in the record about a CBO estimate, and I'm not aware of any. I'm not saying there wasn't one, but that's not in the record, and it wasn't argued by Ms. Ross as well. Ms. Ross is not excused that she failed to satisfy the requirements of subsection D-2. That regulatory provision is clear and unambiguous, and therefore, if there are no further questions, we submit that the decision of the MSPB should be affirmed. Very good. Thank you. Ms. Bell-Lloyd, you have three minutes, if you need it. Just in essence, in summary, as the Court noted, D-2, little 2, will be or is now inoperative based upon the time-filing requirements and at some point in time, the age of the recipient. What I am saying is that this, in essence, does the decree of annulment stating that it applies retroactively from the marriage's inception, only applies to those individuals who meet the criteria under little Roman numeral 2. Scarlett Ross, clearly, I will acknowledge that her entitlement is not based upon 4B-1B or 4B-4. So what is it based on? The fact that she was never remarried. No, no, no. What statutory provision are you saying authorizes OPM to grant her a survivor annuity or a former spouse annuity? Because I'm saying she's still entitled to it because she did not remarry before age 55, and there's no corresponding language in there that talks about any certain language. For example, the decree stating that the marriage is without legal effect retroactively from the marriage's inception. I'm stating that Congress simply said that the benefit would terminate if there was a remarriage before age 55. In this case, Scarlett Ross, now we know, did not remarry before age 55 because the Court in which she was... Does that mean she should have gotten that OPM not only has to resume giving her benefits, but has to give her benefits for that period when they were properly terminated because she did remarry? I mean, that seems to be the logical thrust of your argument, that if she never remarried, they never should have been cut off. So not only do they have to restart her benefits, they owe her a refund. Or not a refund, but they owe her a payment for the time she wasn't getting them. Is that what you're asking for? Well, again, limited that in this case the member was already deceased. If you look at the date and the fact of this case... You're putting an awful lot of limitations out of thin air. I don't see anything in any of the statutes that permit that. Either the statute that gives you benefits and cuts them off at remarriage applies or it doesn't apply. And your argument is it doesn't apply because we should consider that remarriage never to have existed. And if that's the case, she's not only entitled to benefits now, she's entitled to the past due benefits that she didn't get during the chronological period of her remarriage. From the date of her husband's death on, correct? When the benefit would have triggered and it was five or nine. She never remarried. Correct. So there was nothing to cut off her right to the benefits while he was alive or while he was dead? Well, she received her benefits when he was alive. She was cut off from the survivor benefit once he was deceased. A certain number of days or months after she remarried, he notified the OPM, and they stopped taking money out of him and stopped giving her anything, right? No, she retained her benefit under the original decree to obtain her marital portion. What she lost was the survivor annuity. So, yes, they would have terminated the premium reduction out of his share of the benefit, correct. But she was still receiving, prior to death, she was still receiving her marital portion of his retirement. He died while she was still married, correct? Before she got enrolled. Correct. Okay. Thank you. She's entitled to all that money after he's deceased. From the date of death on, yes. That would be my position. Ms. Bell-Lloyd, thank you very much. Thank you. I appreciate it. Case is submitted.